UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
SECURITIES AND EXCHANGE COMMISSION,   :   04 Civ. 6488 (RJH)
:
Plaintiff,   :
:   **MEMORANDUM**
- against -   :   **OPINION AND ORDER**
:
ANGELO HALIGIANNIS, et al.,   :
:
Defendants.   :
:
---------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission ("SEC") moves for default judgment and for summary judgment in this securities fraud action against defendants Angelo Haligiannis, Sterling Watters Group LP ("Sterling Watters" or the "fund"), Sterling Watters Capital Advisors, LLC ("Sterling Advisors"), and Sterling Watters Capital Management, Inc ("Sterling Capital"). The SEC shows through undisputed evidence that defendants issued materially false statements concerning the performance and assets of Sterling Watters and defrauded clients in their role as investment advisors in violation of securities laws. Based on this undisputed evidence, the Court grants SEC's motion for summary judgment. Because the Court finds the SEC has met its burden under Rule 56 of the Federal Rules of Civil Procedures, and because the Court is granting remedies in excess of $30 million, the Court chooses in its discretion not to enter default judgment against the defendants. *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2685 (3d ed. 1998) (district court has discretion in deciding whether to grant default judgment, and may consider a number of factors

1

including the amount of money potentially involved and whether plaintiff will be prejudiced by failure to enter default judgment).

## BACKGROUND

**1.     Civil Proceeding**

On August 11, 2004, the SEC brought this action against defendants, alleging violations of securities laws, including Section 17(a) of the Securities Act of 1933 ("Section 17(a)"), 15 U.S.C. § 77q(a) (2000), Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5 (2005), and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6 (2000).  Defendants failed to file an answer and the Clerk of the Court filed a Certificate of Default on May 3, 2006.  (Smith Decl. Ex. B.)  On August 25, 2004, the Court granted a preliminary injunction enjoining defendants from further securities violations, froze defendants' assets, and ordered a verified accounting of defendants' business.

On October 14, 2004, the Court issued an order holding Haligiannis in contempt after he repeatedly refused to prepare an accounting, and Haligiannis was consequently remanded to prison.[1]  Haligiannis appeared before the Court again on November 5, 2004 and requested he be allowed to purge himself of contempt.  During that hearing, Haligiannis made statements that the SEC relies upon in this motion.  (Black Decl. Ex. I.) The Court discharged Haligiannis and he subsequently prepared an accounting as required

---

[1] In holding Haligiannis in contempt, the Court rejected his attempt to assert his Fifth Amendment privilege in lieu of preparing an accounting, finding that he had waived the privilege when he consented to the terms of the preliminary injunction.

2

by the terms of the August 25, 2004 order.  On May 16, 2006, the SEC filed this motion for default judgment and summary judgment.  Defendant filed no opposition papers.[2]

**2.      Criminal Proceedings**

Haligiannis was also indicted on criminal charges of securities fraud and investment adviser fraud in the Southern District of New York on September 27, 2004.  *See United States v. Haligiannis*, 06 Crim. 161 (S.D.N.Y.).  Specifically, the indictment charged one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5; and one count of investment adviser fraud in violation of 15 U.S.C. §§ 80b-6(1), 80b-6(2) & 80b-17.  (Black Decl. Ex. D.)  Haligiannis plead guilty to these charges.  During allocution at the entry of his plea of guilty to securities fraud, Haligiannis made a number of statements that the SEC relies upon in this motion.  (Black Decl. Ex. F.)  The court set Haligiannis' sentencing for January 11, 2006.  He failed to appear for his sentencing and was indicted for his failure to appear.  (Black Decl. Ex. H.)  Haligiannis' current whereabouts are unknown.

**3.      Defendants**

Haligiannis was president and chief operation officer of Sterling Capital and Sterling Advisors from 1996 until August 2004 ("relevant period").  (Drenis Decl. Ex. B at 10.)  In these capacities, Haligiannis had exclusive control over the management and operation of the Sterling Watters, including all investment decisions.  (*Id.* at 17; Drennis Decl. Ex. C at 7–8.)

Sterling Watters was a Delaware limited partnership formed in 1995, with a place of business in New York City.  (Drenis Decl. Ex. B at 1.)  It operated as a hedge fund, with

---

[2] Also pending before this court is a lawsuit by later investors who lost the majority of their contributions to recover from earlier investors who were able to liquidate their interests for a profit.  *Drenis v. Haligiannis*, 04 Civ. 9263 (RJH), 2006 WL 2720971, 2006 U.S. Dist. LEXIS 68488 (S.D.N.Y. Sept. 25, 2006).

3

a stated goal "to seek an above average economic return" through "equity and equity-derived securities," and offered for sale limited partnership interests to investors. (*Id.*) Sterling Watters' certificate to operate under Delaware laws was cancelled by the Secretary of State of Delaware on June 1, 1998 for neglect, refusal, or failure to pay its annual taxes, and since then it has not officially been in existence. *Drenis v. Haligiannis*, 04 Civ. 9263 (RJH), 2006 WL 2720971, 2006 U.S. Dist. LEXIS 68488, at *9 (S.D.N.Y. Sept. 25, 2006). Notwithstanding, it continued to operate during the relevant period.

Sterling Advisors, a Delaware limited liability company, was responsible for management of the Sterling Watters securities portfolio during the relevant period. (Drenis Decl. Ex. B at 10.). Sterling Capital, a Delaware corporation, was responsible for the administration of Sterling Watters during the relevant period. (*Id.*) Sterling Capital is no longer in existence and is not in good standing under the laws of the State of Delaware as of March 1, 2003. *Drenis*, 2006 WL 2720971, at *8. Although there are four captioned defendants, the two companies and the fund were controlled for all relevant purposes by Haligiannis.

**4.   False Statements**

    *a.   Offering Materials*

The following facts are drawn from evidence submitted by the SEC, including Haligiannis' statements made during his contempt hearings and his plea allocution, and from the SEC's Rule 56.1 Statement of Facts.[3] They are undisputed. In connection with

---

[3] Defendants failed to submit their own Rule 56.1 Statement of Facts, or contest the SEC's Rule 56.1 Statement. Under Rule 56.1(c) of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Therefore, the facts asserted in the SEC's Rule 56.1 Statement are deemed admitted to the extent they are supported by admissible evidence.

4

the sale of Sterling Watters limited partnership interests, defendants distributed a private placement memorandum, a partnership agreement, and a subscription agreement (collectively, "offering materials"). (Drenis Decl. Exs. B, C, D.) The offering materials stated that investors could redeem partnership interests upon thirty days notice at the end of any calendar quarter, that investors would be provided with annual financial statements certified by independent accountants, and that Sterling Advisors and Sterling Capital would furnish unaudited financial statements for each of the first three quarters of each fiscal year to limited partners. (Drenis Decl. Ex. B at 3, 11.) These statements were false. Over the relevant period, defendants never provided fund investors with either annual audited financial statements or with unaudited financial statements for any quarterly period. (*See* Bender Decl. ¶ 5; Drenis Decl. ¶ 7; Ziozis Decl. ¶ 9.) Moreover, by early 2003, defendants began to refuse investor requests to redeem partnership interests in compliance with the terms of the offering materials. (*See, e.g.*, Ziozis Decl. Exs. K, L, M, N; Bender Decl. Ex. F.)

      b.    <u>Quarterly Statements</u>

Over the relevant period, Sterling Watters distributed quarterly statements to the fund's limited partners purportedly reflecting the value of their accounts. (*See, e.g.*, Ziozis Decl. Exs. D, E, F.) These statements contained fictitious account balances and consistently overstated rates of return. Despite the fact that Sterling Watters had been consistently losing money since at least 2000, and was virtually insolvent by the third quarter of 2003,[4] account statements continued to show positive returns and balances in the tens of millions of dollars. (Pl.'s Rule 56.1 Statement of Facts ¶ 21.) During his plea

---

[4] The total balance of the Fund at the end of the third quarter of 2003 was less than $170,000. (Pl.'s Rule 56.1 Statement of Facts ¶ 22.)

allocution, Haligiannis admitted that from May 2000 until July 2004, he "prepared and mailed to investors statements which intentionally artificially inflated the values of investors' securities accounts" for the purpose of "conceal[ing] losses," avoiding "any request for capital distributions," and "soliciting additional contributions." (Black Decl. Ex. F at 23:24–24:14.) He further stated that at the time he was making those statements, he knew them to be false. (*Id.* at 25:12–14.)

  c. *Newsletters*

Beginning no later than July 2000, defendants issued newsletters to potential and existing investors, indicating the fund's superior performance, in an attempt to secure additional investments and investors. (*See, e.g.*, Black Decl. Ex. M.) For example, a newsletter dated July 14, 2000 reported gains of 15.19% during the second quarter of 2000. (*Id.*) In actuality, the fund netted well over $5 million in losses during that quarter. (Pl.'s Rule 56.1 Statement of Facts ¶ 21.)

  d. *Marketing Materials*

Defendants also distributed false marketing materials to current and potential investors concerning the total assets and past performance of the fund. (*See* Drenis Decl. Ex. H.) These documents suggested that the fund had approximately $180 million in assets as of the end of the third quarter of 2003, when in reality, it had less than $170,000.[5] (Black Decl. Ex. K; 8/6/2004 Bruno Decl. Ex. C.) The documents falsely stated that the fund had achieved returns of 1,565% between 1996 and the third quarter of 2003, despite having less than $200,000 in assets at the end of 2003. In 2000 alone, Sterling Watters lost

---

[5] Haligiannis acknowledged at a hearing before this Court to purge himself of contempt that the fund never had $180 million in assets. (Black Decl. Ex. I at 18.)

6

over $17 million while reporting to current and potential investors gains of over 40%. (Pl.'s Rule 56.1 Statement of Facts ¶ 27.)

By the beginning of 2003, Sterling Watters had insufficient assets to continue trading, and began to refuse requests for distributions or to liquidate investors' interests unless it received corresponding contributions from other investors. (Pl.'s Rule 56.1 Statement of Facts ¶ 27.) By early 2004, in a manner similar to a traditional "Ponzi" (pyramid) scheme, Haligiannis used new contributions almost exclusively to make distributions to existing investors or fund unauthorized withdrawals for personal expenses. (*Id.*)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party must demonstrate that no genuine issue of fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If successful, the nonmoving party must then produce specific facts showing a genuine issue of material fact. *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). A nonmoving party's failure to respond to a motion for summary judgment does not relieve the moving party of its burden on summary judgment. Instead, as the Second Circuit recently held, "Fed. R. Civ. P. 56 . . . does not embrace default judgment principles. Even when a motion for summary judgment is unopposed, the district court is

not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

## DISCUSSION

The SEC argues that it is entitled to summary judgment because its evidence shows that there is no genuine issue as to any material fact necessary to prove their claims against Haligiannis. Moreover, the SEC argues that the necessary material facts were established when Haligiannis plead guilty to criminal counts of securities fraud and investment advisor fraud, and Haligiannis is collaterally estopped from relitigating those facts in this case.

### I.    Sections 10(b) and 17(a)

To have violated Section 10(b) and Rule 10b-5 thereunder, defendant must have: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). The standard for establishing a violation of Section 17(a) is "essentially the same . . . though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Id.*; *accord SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). The element of scienter requires a plaintiff "to show that the defendant acted with intent to deceive, manipulate or defraud, or at least knowing misconduct." *Granson v. Merrill Lynch & Co.*, 147 F.3d 184, 194 (2d Cir. 1998).

There is ample undisputed evidence to support a finding of liability for violations of Sections 10(b) and 17(a) beginning in July 2000.[6] The statements made in marketing materials and newsletters falsely inflated the fund's assets and grossly exaggerated the

---

[6] The SEC concedes in its moving papers that this was the earliest date for which it uncovered evidence of defendant's fraud. (Pl.'s Mem. of L. at 14 n.8.)

8

fund's performance. The statements sent to investors falsely inflated their returns. Haligiannis' scienter was demonstrated at his plea allocution, when he admitted to knowingly sending statements to investors that artificially inflated the value of their accounts from May 2000 through July 2004 in order to avoid requests for capital distributions and solicit additional contributions. (Black Decl. Ex. F at 23–25.) In front of this Court, he also acknowledged having knowingly misrepresented the total assets of the fund. (Black Decl. Ex. I at 18). The scienter of Haligiannis, the president and chief operating officer of Sterling Capital and Sterling Advisors, which in turn have exclusive control over the management and operations of Sterling Watters, can be imputed to those entities. *See, e.g.*, *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01 (2d Cir. 2001) (holding that the scienter of an agent of a corporate defendant is attributable to the corporation as a primary violator of § 10(b) and Rule 10b-5); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n. 3 (2d Cir. 1972) (holding that scienter of agent who "controlled" two corporations could be imputed to those entities); *Cromer Finance Ltd. v. Berger*, Nos. 00 Civ. 2284 (DLC) & 00 Civ. 2498 (DLC), 2002 WL 826847, at *7-8 (S.D.N.Y. May 2, 2002) (holding that scienter of partner of accounting firm could be imputed to the firm itself under traditional agency principles). These undisputed facts support a finding of the liability for all defendants, requiring defendants to raise a genuine issue of material fact. Defendants have submitted no opposition to this motion for summary judgment.

The SEC also contends that Haligiannis' criminal conviction under Section 10(b) estops him from relitigating the same facts as they pertain to civil claims under Section 17(a) and 10(b). In order for collateral estoppel to apply, the Court must determine that

9

"(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." *NLRB v. Thalbo Corp.*, 171 F.3d 102, 109 (2d Cir. 1999). It is well settled that "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by judgment in the criminal case." *United States*, 572 F.2d 31, 35 (2d Cir. 1978). Courts have applied collateral estoppel in the securities fraud context because the elements necessary to establish civil liability under Section 17(a) and 10(b) are identical to those necessary to establish criminal liability under Section 10(b). *See, e.g.*, *SEC v. Roor*, 99 Civ. 3372 (HB), 2004 U.S. Dist. LEXIS 17416, 2004 WL 1933578, at *7 (S.D.N.Y. Aug. 30, 2004) (granting summary judgment on Section 17(a) and Section 10(b) claims after finding defendant was estopped from contesting liability based on his pleading guilty to criminal count of Section 10(b) violation); *SEC v. McCaskey*, 98 Civ. 6153 (SWK), 2001 U.S. Dist. LEXIS 13571, 2001 WL 1029053, at *3 (S.D.N.Y. Spt. 6, 2001) (same). Both count one of the indictment, to which Haligiannis pleaded guilty, and claim one and two in this proceeding are based on misrepresentations made by Haligiannis in marketing materials, newsletters, and account statements issued to investors.[7] On balance, the Court believes all elements necessary for collateral estoppel to apply against Haligiannis are satisfied.[8]

---

[7] The complaint in this case also alleges that defendants made false statements in connection with offering materials, while the criminal indictment does not. Although the defendants are not estopped from relitigating this factual allegation, they gain nothing by doing so since their remaining false statements are more than sufficient to support liability under Sections 17(a) and 10(b).

[8] As to the element of finality, the judgment in Haligiannis' criminal trial is not technically "final" because he has yet to be sentenced. *See Berman v. United States*, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case [for purpose of appellate review] means sentence."). However, for purposes of collateral

10

**II.     Investment Adviser Liability – Sections 206(1) and 206(2)**

Section 206 of the Advisers Act provides that:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (1) to employ any device, scheme, or artifice to defraud any client or prospective client; [or] (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . .

15 U.S.C. § 80b-6 (2000). The Second Circuit has held that "people who manage[] the funds of others for compensation are 'investment advisers' within the meaning of the statute." *Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977). Facts showing a violation of Section 17(a) or 10(b) by an investment adviser will also support a showing of a Section 206 violation. *SEC v. Berger*, 244 F. Supp. 2d 180, 188–89 (S.D.N.Y. 2001).

Summary judgment is therefore appropriate upon a showing that Haligiannis, Sterling Capital, and Sterling Advisors were "investment advisers." In his plea allocution, Haligiannis conceded that he was in an "investment advisory relationship" with clients when managing the investments of Sterling Watters. (Black Decl. EX. H at 21:10–15, 24–25.) As for Sterling Advisors and Sterling Capital, both companies were the general partners of Sterling Watters, in exclusive control of all "investment policies and investment objectives." (Drenis Decl. Ex. C at 7.) Together with their liability for violating Section 17(a) and 10(b), this management role with respect to Sterling Watters is adequate to

---

estoppel, "'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." Restatement (Second) of Judgments § 13. Despite Haligiannis not having been sentenced, the Court finds the factual determinations essential to his plea to be sufficiently firm to be accorded collateral estoppel effect. First, it is determinations made at the conviction stage, not the sentencing stage, which are essential to the guilty verdict and to which courts have applied collateral estoppel. *Compare Roor*, 2004 WL 1933578 (defendant collaterally estopped from relitigating factual determinations necessary to guilty plea) *with SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) (defendant not collaterally estopped from relitigating factual determinations made at sentencing proceeding). Second, Haligiannis would have been sentenced in January 2006 had he not chosen to become a fugitive, and there is no telling when, if ever, he will now be sentenced. This Court should not sanction such behavior by denying the application of collateral estoppel.

support liability for these entities under the Advisers Act. Therefore, the Court grants the SEC summary judgment on its claim that Haligiannis, Sterling Capital, and Sterling Advisors violated Sections 206(1) and 206(2).

## III. Remedies

The SEC seeks the following remedies: a permanent injunction against future violations of the securities and investment adviser laws; disgorgement of ill-gotten gains, including prejudgment interest; and a civil monetary penalty. A district court has "broad equitable power to fashion appropriate remedies" upon finding a violation of federal securities laws. *First Jersey Sec., Inc.*, 101 F.3d at 1474.

### a. *Permanent Injunction*

A permanent injunction is appropriate where there has been a violation of the federal securities laws and there is a reasonable likelihood of future violations. *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978).[9] The Court has already granted summary judgment for the SEC finding violations of the federal securities laws. In determining whether there is a reasonable likelihood of future violations, a district court may consider: (1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100; *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976).

The Court finds these factors weigh heavily in favor of issuing the injunction. During the relevant period, contributions exceeded $40 million. By the year 2004, all

---

[9] Because this remedy is derived from statute, there is no requirement that the SEC demonstrate irreparable harm as there generally is for permanent injunctions. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).

12

trading had ceased and Haligiannis was managing Sterling Watters purely as a "ponzi" scheme, using contributions not for investment, but to pay liquidating investors and himself. Haligiannis not only had knowledge of the false statements being made, but intended them to induce additional contributions and prevent calls for distributions. The fraudulent conduct continued over a period of years, and involved hundreds of fraudulent quarterly statements in addition to numerous false newsletters and marketing materials. There is no possibility whatsoever that Haligiannis believed his actions were within the bounds of the law. Finally, Haligiannis, rather than expressing remorse and assuring the Court that he would not commit future violations, required jail time and a contempt proceeding before performing an accounting and is now a fugitive. These factors suggest the likelihood of future violations in the absence of a permanent injunction. Therefore, the Court permanently enjoins all defendants from future violations of Sections 17(a) and 10(b) and Haligiannis, Sterling Capital, and Sterling Advisors from future violations of Sections 206(1) and 206(2).

      b.      *Disgorgement; Prejudgement Interest*

A district court has broad discretion to order disgorgement of profits from illegal activities. *First Jersey Sec., Inc.*, 101 F.3d at 1474. The primary purpose of disgorgement is not to compensate victims or punish the wrongdoer, but rather "to prevent wrongdoers from unjustly enriching themselves through violations," and thereby deter subsequent fraud. *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Therefore, a district court can order disgorgement of all profits reaped from securities fraud, even if it exceeds actual damages to victims. *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987). The amount of disgorgement ordered by a court for violation of the securities laws need not be an exact

calculation of the defendant's profits, but only "a reasonable approximation of profits causally connected to the violation." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Because such calculations are "not capable of exactitude," any "risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty."  *Patel*, 61 F.3d at 140 (quoting *First City Fin. Corp.*, 890 F.2d at 1232).

From July 14, 2000 until 2004, there were total investor contributions of approximately $43,499,358 and total investor distributions of approximately $27,863,496 for a difference of approximately $15,635,862.  After the securities and investment adviser fraud began, contributions may be considered ill-gotten gains as a result of the fraud, although distributions must be subtracted as they did not unjustly enrich defendant. *See S.E.C. v. Invest Better 2001*, 01 Civ. 11427 (BSJ), 2005 U.S. Dist. LEXIS 34654, 2005 WL 2385452, at *9 (S.D.N.Y. May 4, 2005) (calculating disgorgement in "ponzi" scheme by subtracting total distributions from total contributions).  The burden falls on defendants to dispel uncertainty as to the proper calculation of disgorgement and they have not done so.  Therefore, the Court finds a proper estimation of defendant's ill-gotten gains to be the total difference between contributions and distributions after the fraud began in July 14, 2000,[10] and orders defendants to disgorge $15,635,862.[11]

---

[10] The SEC requests that in addition to being required to disgorge the entire difference between contributions and distributions from the period July 14, 2000 until the Fund ceased operations, Haligiannis also be required to disgorge the entire balance of the fund as of July 31, 2000 in the amount of $12,546,304.  The Commission contends that had defendants accurately reported the fund's performance, limited partners would have liquidated their holdings, but points the Court to no cases where such a calculation was used.  The Court declines to use this calculation as a proper approximation of Haligiannis' ill-gotten gains.

[11] Due to Haligiannis' fugitive status, a restitution order has not yet been entered in the criminal action.  The SEC recommends, and the Court so orders, that any amount eventually paid toward restitution in the criminal action shall be credited against the amount of disgorgement ordered in this opinion.

The SEC also seeks prejudgment interest on the disgorged funds. As with disgorgement, an award of prejudgment interest lies within the discretion of the Court. *First Jersey Sec., Inc.*, 101 F.3d at 1476. "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Generally, prejudgment interest is calculated at the IRS underpayment rate because "that rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud." *First Jersey Sec., Inc.*, 101 F.3d at 1476. The Court finds prejudgment interest at the IRS underpayment rate to be appropriate. Accordingly, the Court directs the SEC to calculate the prejudgment interest owed on $15,635,862 for the period from August 11, 2004 until the date of this order, together with a per diem interest charge that shall be applied by the Court until the date of judgment.

When apportioning liability for disgorgement among multiple defendants, courts have the discretion to find joint and several liability when two or more individuals collaborate in the illegal conduct. See *First Jersey Securities, Inc.*, 101 F.3d at 1475. In this case, Haligiannis was clearly responsible for the activities of all three entities. No company can claim any less responsibility for the fraud perpetrated on the limited partners. Therefore, the Court finds that Haligiannis, Sterling Capital, Sterling Advisors, and Sterling Watters are all joint and severally liable for the full amount of disgorgement plus prejudgment interest.

  *c.*  <u>*Civil Penalties*</u>

Finally, the SEC asks the Court to impose a civil monetary penalty on defendants pursuant to Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77u(d) (2000), and Section 209 of the Advisers Act, 15 U.S.C. § 80b-9 (2000). These statutes authorize the Court to impose monetary penalties "in light of the facts and circumstances" of the fraud. 15 U.S.C. 78u(d)(3)(B)(i) (2000). The statutes provide for three "tiers" of penalties, the most severe requiring "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and that the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* The SEC argues that defendants' actions qualify for third tier penalties and the Court agrees. The amount of the penalty for each violation under the third tier must "not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person,[12] or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation[.]" 15 U.S.C. §§ 77t(d) & 78u(d) (2000). Each of the quarterly statements sent to each of the investors is a materially false statement that technically constitutes an independent violation of the Securities Act.

Civil penalties are designed to punish the individual violator and deter future violations of the securities laws. *SEC v. Moran*, 944 F.Supp. 286, 296 (S.D.N.Y. 1996). In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the

---

[12] Since February 2, 2001, that amount has been increased to $120,000 per violation for natural persons and $600,000 per violations for any other person. *See* 17 C.F.R. §201.1002 (2006).

16

defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Coates*, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001) (listing factors). The Court has already considered most of these factors in deciding whether to grant the preliminary injunction and finds that they weigh heavily against defendants and in favor of civil penalties. Haligiannis' purposeful scheme resulted in the loss of millions of dollars by a large number of victims through fraud perpetrated over a number of years. Furthermore, the Court is unable to evaluate Haligiannis' assets as he has become a fugitive, and will thus assume that he has fled with substantial profits from his fraudulent conduct. His behavior, both at issue in this case and after the complaint was filed, is reprehensible and the civil penalties levied by the Court will so reflect. Because the SEC has not presented the Court with an exact count either of the number of defrauded investors or the number of fraudulent account statements, the Court instead orders defendants to pay a penalty in the approximate amount of his ill-gotten gains: $15,000,000. *See Invest Better 2001*, 2005 WL 2385452, at *4 (ordering civil penalty equal to defendant's pecuniary gain due to difficulty calculating total number of violations).[13]

## CONCLUSION

For the foregoing reasons, SEC's motion for summary judgment [44] is granted. The SEC shall submit a proposed judgment as appears on the following page, containing its calculations of prejudgment interest to the date of this order and the per diem interest charge that shall be applied until the date judgment is entered.

---

[13] As with disgorgement and prejudgment interest, the Court holds all four defendants to be joint and severally liable for civil penalties, as there is no meaningful difference in their culpability.

SO ORDERED:

Dated: New York, New York
       January 16, 2007

_____
Richard J. Holwell
United States District Judge