UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          - against -

ANGELO HALIGIANNIS, ET AL.,

                    Defendants.

---

1:04-cv-06488-RJH

**MEMORANDUM
OPINION AND ORDER**

Richard J. Holwell, District Judge:

          Angelo Haligiannis was convicted of engineering a Ponzi scheme that defrauded

investors of millions of dollars.  Before sentencing, Haligiannis fled the country, leaving

behind nothing but his house.  In this parallel civil enforcement action, the Court directed

JPMorgan Chase Bank to foreclose Haligiannis's house and deposit the surplus from the

sale with the Court.  Having given all interested parties an opportunity to present

evidence and argument, this opinion resolves the claims to the surplus generated in the

foreclosure sale.  For the reasons set forth below, the Court finds that West End Equities,

LLC, Marina District Development LLC, and Anthony Devito are entitled to be paid out

of the foreclosure proceeds.  A lien held by EMB Construction Corp., however, reflects a

fraudulent transfer and will be avoided.  Finally, liens held by the SEC take priority over

a lien held by the remaining non-party claimant, the Internal Revenue Service.

I.        **BACKGROUND**

A.        **The SEC's Civil Action Against Haligiannis**

          The facts of this case are set out at length elsewhere.  *See SEC v. Haligiannis*, 470

F. Supp. 2d 373, 377-80 (S.D.N.Y. 2007); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418,

422-24 (S.D.N.Y. 2006); *see also* Robert Kolker, *Take the Hedge-Fund Money and Run*, N.Y. Mag., Oct. 23, 2006, at 38.

Briefly, the case began when the Securities and Exchange Commission on August 11, 2004 filed a civil complaint against Angelo Haligiannis, Sterling Watters Group LP, Sterling Watters Capital Advisors, LLC, and Sterling Watters Capital Management, Inc. (collectively, "Sterling Watters"). (*See* Compl. (Aug. 11, 2004) ("SEC Compl.").) The SEC alleged that Haligiannis had convinced a number of individuals to invest at least $27 million in Sterling Watters, a hedge fund, by grossly misrepresenting the fund's performance. (*Id.* ¶ 1.) While Sterling Watters' books reflected tens of millions of dollars in equity, the fund was in fact penniless. (*Id.* ¶ 1.) The SEC sought (i) temporary and permanent injunctions freezing Haligiannis's assets; (ii) a judgment ordering Haligiannis to disgorge his ill-gotten gains; and (iii) civil penalties under § 20 of the Securities Act of 1933, 15 U.S.C. § 77a (2006) (the "Securities Act"), § 21(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a (2006) (the "Exchange Act"), and § 209 of Investment Advisers Act of 1940, 15 U.S.C. § 80a-1 (2006) (the "Advisors Act"). (*Id.* at 16-17.)

Two weeks after the SEC filed its complaint, the Court entered a temporary injunction (the "asset freeze") freezing Haligiannis's assets. (*See* Prelim. Inj. and Order Freezing Assets and Granting Other Relief (Aug. 25, 2004).) The fourth section of the asset freeze prohibited anyone acting "in active concert or participation" with Haligiannis or Sterling Watters from dissipating or encumbering Haligiannis's assets:

> "[P]ending a final disposition of this matter, each of the Defendants, and
> each of their financial and brokerage institutions, officers, agents,
> servants, employees, attorneys-in-fact, and those persons in active concert
> or participation with them who receive actual notice of such Order . . .

> [shall] hold and retain within their control, and otherwise prevent, any
> withdrawal, transfer, pledge, encumbrance, assignment, dissipation,
> concealment or other disposal of any assets, funds, or other property . . . .
> (*Id.* § IV.)

The asset freeze's tenth section provided that "no creditor or claimant against any of the

Defendants, or any person acting on behalf of such creditor or claimant, shall take any

action to interfere with the taking control, possession, or management of the assets."  (*Id.*,

§ X.)  Consistent with Federal Rule of Civil Procedure 65(d)(2), the asset freeze only

applied to persons who "receive[d] actual notice of it by personal service or otherwise."

It bound (i) the parties (i.e., Haligiannis and various Sterling Watters entities); (ii) their

"officers, agents, servants, employees, and attorneys;" and (iii) "other persons who are in

active concert or participation" with the parties, their officers, agents, servants,

employees, and attorneys.  Fed. R. Civ. P. 65(d)(2)(A)-(C).  *See New York v. Operation*

*Rescue Int'l*, 80 F.3d 64, 70 (2d Cir. 1996) ("Rule 65(d) codifies the well-established

principle that, in exercising its equitable powers, a court 'cannot lawfully enjoin the

world at large.'" (interpreting 1987 version of Rule 65).[1]

Haligiannis was scheduled to be sentenced for securities fraud in a related

criminal case on January 11, 2006.  Instead of appearing, he fled the country.  According

to press reports, Haligiannis is now incarcerated in Greece, where he was discovered

vacationing with his ex-wife, Liz Batalias.  (*See, e.g.*, Associated Press, *Former Head of*

*Hedge Fund Wanted in U.S. Arrested for 2nd Time in Greece*, Sept. 20, 2007; Brad

---

[1] Rule 65 was amended in 2001 and 2007.  The 2001 amendment added subdivision (f),
which applies the Rule to copyright-impoundment proceedings.  Fed. R. Civ. P. 65
Advisory Committee Notes, 2001 Amendment, 28 U.S.C.A. Rule 65, at 104-05 (2008).
The 2007 amendments were "intended to be stylistic only."  Fed. R. Civ. P. 65 Advisory
Committee Notes, 2007 Amendment, 28 U.S.C.A. Rule 65, at 105 (2008).  Thus, prior
caselaw continues to accurately reflect the meaning of Rule 65.

Hamilton, *Hedge Fugitive Freed – Feds Facing Herculean Extradition Task*, N.Y. Post,

Aug. 26, 2007, at 30; Sam Gustin & Paul Tharp, *Trader on Lam – Convicted Hedge Fund*

*Fraudster Skips Bail*, N.Y. Post, Jan. 14, 2006, at 23.)



A photograph that purportedly shows Angelo
Haligiannis, with ex-wife Liz Batalias, moments
before he was arrested by Greek police.  Source:
nypost.com

On January 16, 2007, the Court granted summary judgment to the SEC in its civil

action, finding that all the defendants had violated §§ 10(b) and 17(a) of the Exchange

Act (*Haligiannis*, 470 F.Supp.2d at 381), and that Haligiannis, Sterling Capital, and

Sterling Advisors had violated §§ 206(1) and 206(2) of the Advisors Act (*id.* at 383).

The Court permanently enjoined Haligiannis from committing future violations of the

Exchange and Advisors Acts (*see id.* at 384); ordered Haligiannis to disgorge

$15,635,862, plus interest calculated at the IRS underpayment rate (*id.* at 385); and

imposed a civil penalty of $15,000,000 on Haligiannis (*id.* at 386).  A final judgment was

docketed on January 22, 2007.  On March 5, 2007, the SEC recorded liens against

Haligiannis's property in New York and Nassau counties.  (*See* Exs. A & B to Decl. of

Scott L. Black in Supp. of Pl.'s Mem. of Law with Respect to Disposition of Funds Held in Court Registry (Jan. 18, 2008).)

**B.      Proceedings Related to the Sale of Haligiannis's House**

Shortly before granting summary judgment, the Court modified the asset freeze to allow JPMorgan Chase Bank ("Chase") to foreclose on Haligiannis's house, located at 166 Bayview Road, Manhasset, New York.   (*See* Order Modifying Asset Freeze (Dec. 1, 2006).)  As amended, the order directed that the proceeds from the sale be used to pay (i) a lien arising from the primary mortgage on Haligiannis's house, (ii) a lien arising from a home equity line of credit obtained by Haligiannis, and (iii) the fees, costs, and expenses of the state foreclosure proceeding.  (*See* Order Modifying Order Dated Nov. 15, 2006 (Feb. 13, 2007).)  The remaining surplus was to be paid to the Clerk of the United States District Court for the Southern District of New York.  Chase did this on February 27, 2007.

By letter dated April 13, 2007, the SEC informed the Court that it had been contacted by a number of persons who claimed to be entitled to the surplus generated in the foreclosure sale.  (*See* Letter from Scott Black to Hon. Richard J. Holwell, at 1 (Apr. 13, 2007).)  In a subsequent report, the SEC informed the Court that a title search on Haligiannis's property revealed five claimants to the surplus from the foreclosure sale. They are:

1.  EMB Construction Corp. ("EMB"), which holds an $800,000 balloon mortgage recorded on January 7, 2005;

2.  West End Equities, LLC ("West End"), which holds a $134,235.03 judgment lien recorded on April 22, 2005;

3.  Marina District Development LLC/Borgata ("Borgata"), which holds a $26,926.32 judgment lien recorded on September 26, 2005;

4.   Anthony Devito, who holds a $2,700 mechanic's lien recorded on March 22, 2006; and

5.   the Internal Revenue Service, which holds a tax lien.

(Letter from Scott L. Black to Hon. Richard J. Holwell & Ex. A (June 29, 2007) ("June 29 Report").)

After directing notice to these claimants, the Court held a conference on September 5, 2007.  With the exception of Devito and the IRS, all claimants appeared. (*Compare id.* at 2-3 with Tr. of Arg. on Mot., at 2-3 (Sept. 5, 2007) ("Sept. 5 Tr.").) After hearing from the parties, the Court ordered a 90-day window for discovery, followed by simultaneous submission of briefs, memoranda, and factual affidavits.  (Sept. 5, 2007 Tr., at 24.)  By February 1, 2008, all claimants (again, with the exception of Devito and the IRS) submitted affidavits and memoranda in support of their claims to the foreclosure proceeds.  As the claimants rested on the affidavits and exhibits submitted in support of their claims, the Court did not hold a further evidentiary hearing.

## II.   DISCUSSION

### A.   Standards Governing Distribution of the Foreclosure Proceeds

The choice of an appropriate remedy for Haligiannis's violations of the federal securities statutes is a question of federal law, committed to the equitable discretion of this Court.  *See, e.g.*, *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *SEC v. Certain Unknown Purchasers of Common Stock of and Call Options for Common Stock of Santa Fe Int'l Corp.*, 817 F.2d 1018, 1020 (2d Cir. 1987).  The Court's equitable authority, however, does not extend to abrogating property rights created by state law and protected by due process; equity follows the law.  *Hedges v. Dixon County*, 150 U.S. 182, 192 (1893).  For purposes of this proceeding, the Court therefore will recognize a

claimant's interest in the proceeds of the foreclosure sale to the extent a New York court would, provided that the claimant's interest was not acquired in a manner that conflicts with federal law.

Under New York law, the general rule as to priority of liens is that "the first in time is the first in right."  75 N.Y. Jur. 2d Liens § 46, at 187 (2000).  Following a foreclosure sale, "[t]he parties who had estates or interests in the land sold . . . are entitled to be paid out of the surplus moneys the equivalent of their respective interests, in the order of priority as between each other, as far as it will go."  79 N.Y. Jur. 2d Mortgages and Deeds of Trust § 822, at 162 (2003).  Consistent with these principles, the Court will address the claimants' liens in the order in which they were created and recorded.

## B.     EMB

EMB's claim is based on a mortgage that Haligiannis purportedly executed on March 23, 2004.  (June 29 Report, Ex. A.)  According to Michael Batalias, the President of EMB and Haligiannis's former father-in-law, Haligiannis executed the mortgage in consideration for an $800,000 loan EMB extended to Haligiannis in March 2004.  (Aff. of Michael Batalias on Behalf of EMB Construction Corp. ¶ 3 (Jan. 2, 2007) ("Batalias Aff.").)  EMB did not record the mortgage until January 7, 2005, well after Sterling Watters was revealed as a fraud.  (*Id.*)  Since the Court finds that Haligiannis acted with fraudulent intent in granting the mortgage, it will be avoided pursuant to the fraudulent transfer provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 (2006) (the "FDCPA" or "Act").

The FDCPA establishes "the exclusive civil procedures for the United States . . . to recover a judgment on a debt . . . ."  § 3001(a)(1)(A).  Debts subject to the Act include

civil penalties, such as those the Court imposed against Haligiannis.  § 3002(3)(B); *see United States v. Coluccio*, 51 F.3d 337, 339 (2d Cir. 1995) (holding criminal fines subject to FDCPA); *United States v. Bongiorno*, 106 F.3d 1027, 1036 (1st Cir. 1997) ("[C]ourts have tended to draw the line between included and excluded debts depending on whether a particular debt is owed to the United States in the sense that the debt's proceeds, if collected, will inure directly to the government's benefit (in contrast to benefiting a third party).").

Under the Act's fraudulent transfer provisions, *see* §§ 3301-3308, "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . with actual intent to hinder, delay, or defraud a creditor."  § 3304(b)(1)(A).  Although the Act is designed to facilitate collection of debts owed to the government, *see Bongiorno*, 106 F.3d at 1036, this provision by its plain language applies if a debtor intends to defraud *any* creditor.  The Act thus parallels the Uniform Fraudulent Transfer Act and the Bankruptcy Code, apparently sacrificing tighter fit between the statute's purposes and the conduct it proscribes for greater uniformity in the law.[2]  In § 3304(b)(2), the Act sets out a

---

[2] The Uniform Fraudulent Transfer Act provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud *any creditor* of the debtor . . . ."  Unif. Fraudulent Transfer Act § 4, 7A U.L.A. 58 (2006) (pt. II) (emphasis added).

The Bankruptcy Code provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily

nonexclusive list of factors a court may consider in determining whether a transfer was made with culpable intent.

After consideration of these factors, the Court finds that in granting EMB a security interest in his property, Haligiannis at a minimum intended to "hinder" and "delay" other investors' attempts to recoup their investment in Sterling Watters. Haligiannis granted the mortgage to an insider, his father-in-law. *See* §§ 3301(E), 3306(b)(2)(A). When he executed the mortgage, he almost certainly was aware that he was insolvent (or on the verge of insolvency), and that his fraud was about to be revealed. *See* § 3304(b)(2)(I); SEC Compl. ¶ 22; First Amended Compl., *Drenis et al. v. Haligiannis*, No. 04 Civ. 9263 ¶ 70 (RJH) (Mar. 30, 2005) ("Drenis Compl."). He likely had been threatened with suit, *see* § 3304(b)(2)(D); Drenis Compl. ¶¶ 71, 74. Soon after executing the mortgage, Haligiannis was sued by the SEC and incurred a substantial debt. *See* § 3306(b)(2)(J). Eighteen months later, he fled the country. *See* § 3306(b)(2)(F).

Taken together and viewed against the backdrop of Haligiannis's unraveling fraud, these factors support two findings about Haligiannis's state of mind when he granted EMB the mortgage. First, Haligiannis likely intended to convert an illiquid asset

---

> or involuntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud *any entity* to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ." 11 U.S.C. § 548(a)(1)(A) (2006) (emphasis added).

Interestingly, the version of § 3304 originally passed by the House of Representatives required "actual intent to hinder, delay, or defraud the *United States*." H.R.Rep. No. 101-736, at 19 (1990) (emphasis added), *reprinted at* 1990 U.S.C.C.A.N. 6472. By the time the provision became law, it had been amended to its present form. *See* Pub. L. No. 101-647, Title XXXVI, § 3661 (1990). Because § 3304's language is plain and unambiguous, the Court need not give controlling weight to this legislative history. *Cf. United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward statutory command, there is no reason to resort to legislative history.").

- 9 -

(his house) into a liquid one at a time when he would have faced difficulty obtaining capital from other sources.  But second, and more importantly, Haligiannis intended that the Batalias family, alone among the investors defrauded by Sterling Watters, would recoup some of its losses when his fraud was exposed.  True, EMB appears to have given reasonably equivalent value for the mortgage.  But because the inevitable effect of granting the mortgage was to lock up Haligiannis's sole remaining asset, Haligiannis traded away something that in equity belonged to Sterling Watters' defrauded investors. *Cf. United Parcel Service, Inc. v. Jay Norris Corp.*, 423 N.Y.S.2d 125, 127 (N.Y. Sup. 1979) ("[T]he fact that a consideration appears in the sales agreement will not be sufficient to prevent the conveyance from being fraudulent if plaintiff can prove an actual intent to hinder, delay or defraud creditors.").  The Court therefore finds that Haligiannis intended the natural consequence of his act—to "hinder" and "delay" other investors' ability to recover their funds upon Sterling Watters' collapse.  § 3304(b)(1)(A).  *See Sandstrom v. Montana*, 442 U.S. 510, 521-24 (1979) (in criminal trial, finder of fact may draw permissive inference that defendant intended natural consequences of his acts).[3]

Anticipating this conclusion, EMB argues that because Mr. Batalias was not aware of Haligiannis's fraud when he granted the mortgage, EMB is protected by the FDCPA's good-faith transferee provision, 28 U.S.C. § 3307(d).  (Batalias Aff. ¶ 4.)  But this argument relies on a mistaken premise—that good faith is judged as of "the time the

---

[3] As one treatise notes, there is apparently a conflict of authority under other fraudulent transfer laws over whether a "mixed motive" transaction is voidable.  Peter Spero, *Fraudulent Transfers: Applications and Implications*, § 2:5, at 2-8 (2005).  The trend in modern cases, however, is to hold that a transfer is voidable if the debtor is only partially motivated by fraudulent intent.  *Id.* § 2:5, at 2-9 n.4.  This rule is well supported by the text of § 3304, which refers simply to "actual intent to hinder, delay, or defraud a creditor."  Thus, to the extent Haligiannis acted with mixed motives in granting the mortgage, this fact does not preclude finding his transfer fraudulent.

loan was made." (*Id.*)  As already noted, EMB did not record the mortgage until January 7, 2005—some five months after the SEC filed its complaint and the Court entered the asset freeze order.  In § 3305(1)(A), the FDCPA provides that,

> [a] transfer is made . . . with respect to an asset that is real property . . . when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.  § 3305(1)(A).

Since New York is a "race-notice" state, *see* N.Y. Real. Prop. Law § 291 (McKinney 2006), the time for judging EMB's good faith is not when the mortgage was granted, but when it was recorded, as this is when the transfer of a security interest in the property took place under § 3305(1)(A).  This makes good sense.  While fraudulent transfer law generally protects innocent creditors who receive a debtor's property without knowing of his fraudulent intent, *see, e.g.*, *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d. Cir. 1995) (applying New York Uniform Fraudulent Conveyance Act), a transferee's delay in recording a mortgage may itself signal the existence of fraud, *see Marc Rich Co. A.G. v. United States (In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983)*, 731 F.2d 1032, 1041 (2d Cir. 1984) ("The fraudulent nature of a conveyance may be inferred from the relationship among the parties to the transaction and the secrecy of the sale . . . ."); Spero § 2:6, at 2-11 to 2-12; Garrard Glenn, *The Law of Fraudulent Conveyances* § 306, at 411-12 (photo. reprint 1996) (1931).  Judging good faith based on when a mortgage is recorded resolves the tension between the policy of protecting innocent creditors and the fraud-signaling effect of a delay in recording by imposing a de minimus duty on a

transferee.  To protect his interest, the transferee need only record it—something that most good-faith transferees would do in the ordinary course of business in any event.[4]

Judged as of January 7, 2005, EMB did not act in good faith in recording the mortgage.  First, recording the mortgage likely violated the asset freeze order.  By this point, Batalias unquestionably knew of Haligiannis's fraud.  (*See, e.g.*, Batalias Aff. ¶ 6; Associated Press, *SEC Accuses Hedge Fund Sterling Watters of Defrauding Investors*, Aug. 12, 2004; *Fund Manager Indicted*, N.Y. Times, Oct. 1, 2004, at C2.)  There is thus a strong argument that by recording the mortgage, EMB aided and abetted Haligiannis's plan, hatched in March 2004, to unlawfully encumber his assets.

The Court need not go this far, however, since even if there was no violation of the asset freeze, Batalias's knowledge of Haligiannis's fraud would be fatal to EMB's good faith argument.  Under "principles of law and equity," expressly made applicable to the FDCPA by § 3308, a transferee must take without knowledge of the transferor's fraudulent intent to be protected by a good faith defense.  *See, e.g.*, *HBE Leasing*, 48 F.3d at 636 (under New York law, "the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme"); *Le Café Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000) (under New York law, "[g]ood faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer"); Spero § 4:12, at 47-17 ("If the transferee knew, or should have known, of the

_____

[4] Here, it is worth noting Mr. Batalias's explanation for not recording the mortgage—that he wanted to avoid paying real estate transfer taxes.  (Batalias Aff. ¶ 5.)  Whatever the business sense of that decision, EMB clearly assumed the risk that another creditor would acquire a superior interest in Haligiannis's property when it chose not to record the mortgage.

debtor's fraudulent purpose, then the transaction is not one carried out in good-faith, regardless of the presence of other factors."). Since Batalias was well aware of Haligiannis's fraudulent schemes when EMB recorded the mortgage, thereby effecting a transfer under § 3305(1)(A), EMB is not a good faith transferee.

If a transfer or obligation falls within the FDCPA's fraudulent transfer provision, the United States may "avoid[] the transfer or obligation to the extent necessary to satisfy the debt to the United States." 28 U.S.C. § 3306(a)(1). Here, honoring the mortgage would exhaust the fund generated by the sale of Haligiannis's house and leave nothing left to satisfy Haligiannis's debt to the United States. The mortgage, therefore, should be avoided entirely. Notably, since EMB is a member of the investor class entitled to participate in the SEC's distribution plan, this remedy does not eliminate EMB's interest in the proceeds of the foreclosure sale completely. Instead, it simply restores EMB to the position it would have been in had Haligiannis not attempted to give EMB priority in the inevitable race to the courthouse that occurred when Sterling Watters collapsed. Equity demands nothing less.

## C.     West End

West End's lien originates in a fraud lawsuit that two Sterling Watters investors, Vincent and Gail Princiotta, brought against Haligiannis. According to records maintained by the New York State Unified Court System, the Princiottas filed their action on May 5, 2004. On February 9, 2005, the New York County Clerk's Office entered a $134,235.03 default judgment in favor of the Princiottas. (Aff. of Ben Hershkowitz in Supp. of West End Equities LLC's Cl. to Proceeds of Sale ¶ 3 & Ex. A (Jan. 14, 2008).) The Princiottas filed the judgment in the office of the Nassau County Clerk on April 8,

2005.  (*Id.* ¶ 4 & Ex. B.)  On January 11, 2007, they sold it to West End.  (*Id.* ¶ 6 & Ex. C.)  West End notes that "there is no evidence that Princiotta ever had notice of [the asset freeze]," and maintains that it never received notice of asset freeze.  (*Id.* ¶ 31.)

The SEC argues that by obtaining a judgment against Haligiannis two months after the asset freeze was entered, "the Princiottas not only violated the plain language of the Asset Freeze, but undermined the very purpose of the Asset Freeze itself, seeking to place themselves above the dozens of other investors, who were equally defrauded . . . ." (SEC Mem. 5.)  Yet the record contains no evidence that the Princiottas or West End acted in active concert or participation with Haligiannis or his agents; and it is undisputed that the Princiottas were victims of Haligiannis's fraud.  At best, the Princiottas and West End were creditors prohibited from taking "any action to interfere with the taking control, possession, or management of the assets."  (Asset Freeze § 10).  But to be bound by this clause, the Princiottas or West End would had to have known of the asset freeze.  *See* Fed. R. Civ. P. 65(d) ("The order binds only the following who receive *actual notice* of it by personal service or otherwise . . . ." (emphasis added)); *see, e.g.*, *NLRB v. Blackstone Mfg. Co.*, 123 F.2d 633, 635 (2d Cir. 1941) (L. Hand, J.) ("[E]quity has always treated as contumacious those who take an actual part in the defendant's own violation of its injunction, provided they have notice of the decree . . . .").  No claimant has offered evidence that notice of the asset freeze was given to, or received by, the Princiottas or West End.  Thus, while the Court recognizes that competing equitable interests are at play, West End is entitled to be paid out of the foreclosure proceeds.

**D.     Borgata**

Borgata's lien originates in a dishonored countercheck that Haligiannis presented while gambling in Atlantic City.  (Aff. on Behalf of Marina Dist. Dev. Co. LLC T/A Borgata ¶ 3 (Jan. 17, 2008).)  According to records maintained by the Superior Court of Atlantic County, New Jersey, Borgata originally filed an action against Haligiannis on December 13, 2004.  On September 8, 2005, Borgata obtained a default judgment based on the New Jersey judgment in the Supreme Court of the State of New York, New York County.  (*Id.* ¶ 3 & Ex. B.)  On April 8, 2005, Borgata filed the judgment with the Office of the Nassau County Clerk.  (*Id.* ¶ 3 & Ex. C.)

As with West End, the SEC argues that Borgata violated the asset freeze in obtaining and recording a judgment against Haligiannis.  (*See*  SEC Mem. 5.)  But again, and in spite of the liberal discovery by the Court ordered, the record contains no evidence that Borgata acted in active concert or participation with Haligiannis or his agents, or received notice of the asset freeze.  Accordingly, Borgata is entitled to be paid out of the foreclosure proceeds.

**E.     Devito**

Devito's claim, which the SEC does not contest, arises from a $2,700 mechanic's lien for landscaping work performed between December 5, 2002 and December 1, 2005.  (*See* Ex. A to June 29 Report.)  There is no reason to believe that Devito was aware of the asset freeze or acted in concert with Haligiannis.  Accordingly, Devito is entitled to $2,700.

### F.     IRS

The IRS holds a tax lien on Haligiannis's property created by I.R.C. § 6321.

Since this lien was never recorded, *see* I.R.C. § 3626(f)(4), the SEC's lien takes priority.

### III.     CONCLUSION

The Clerk is directed to make the following disbursements from the Court

Registry Investment System account associated with this action upon the entry of

judgment:

1. $134,235.03 to West End Equities, LLC;

2. $26,926.32 to Marina District Development Co LLC T/A Borgata; and

3. $2,700 to Anthony Devito.

The SEC is directed to submit a proposed plan of distribution for the remaining

funds within 60 days of this order.  EMB's motion for first lien on the assets held by the

Court [80] is denied.  The Clerk is directed to deliver a copy of any judgments entered in

this matter to the Nassau County Clerk for recording in the files of the property located at

166 Bayview Road, Manhasset, New York.

SO ORDERED.


Dated: New York, New York
       February **11**, 2009

                                          Richard J. Holwell
                                          United States District Judge